DEMARCO H. AS-SAFFAT,

        Petitioner,

Case No. 21-cv-1241-pp

  v.

MICHAEL MEISNER,

        Respondent.

## ORDER DENYING *HABEAS* PETITION, DENYING AS MOOT PETITIONER'S MOTION FOR RELEASE (DKT. NO. 28), DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY AND DISMISSING CASE

The petitioner filed a petition for writ of *habeas corpus* under 28 U.S.C. §2254 challenging his judgment of conviction in Milwaukee County Case No. 2014CF1066 on charges of child enticement—sexual contact and second-degree sexual assault of a child. Dkt. Nos. 1; 11-1 at 1. The petitioner—who represented himself at sentencing and on appeal—raises four grounds for relief. He asserts that he was denied the right to self-representation at trial, that he received ineffective assistance of counsel, that the state improperly reissued charges in violation of a state statute and that the state violated his speedy trial rights. Dkt. No. 1. The petitioner also filed a motion for release on a personal recognizance bond pending the disposition of the *habeas* petition. Dkt. No. 28.

The petition faces insurmountable obstacles, including procedural default and the fact that it contains claims that are not cognizable on federal

1

review. The court will deny the petition, dismiss the case and deny as moot the petitioner's motion for release.

## I. Background

### A. Underlying State Case

The Wisconsin Court of Appeals provided the following summary of the underlying facts:

> In 2013, [the petitioner] led a thirteen-year-old girl who had run away from home into a motel room and sexually assaulted her. When police attempted to arrest [the petitioner], he fled. When they found him days later, he locked himself in a basement furnace room and resisted arrest.
>
> The State filed a criminal complaint in Milwaukee County Case No. 2013CF4277, charging [the petitioner] with child enticement and second-degree sexual assault of a child. After the initial appearance, the circuit court dismissed the case without prejudice because the complaint did not specify the address at which [the petitioner] committed the crimes.
>
> The State reissued the charges in Milwaukee County Case No. 2013CF4303. [The petitioner] waived the preliminary hearing and was bound over for trial. On the day that trial was to begin, the circuit court dismissed the case without prejudice because the victim, who was residing out of state, was unable to appear due to adverse weather conditions.
>
> The State reissued the charges again in Milwaukee County Case No. 2014CF1066, along with two additional counts of obstructing or resisting an officer. Following a preliminary hearing, [the petitioner] was bound over for trial.
>
> At the final pretrial hearing, on June 13, 2024, [the petitioner] told the circuit court that he wanted to represent himself. The court did not immediately address [the petitioner's] request. It said, "I'll tell you what we're going to do, we'll finish the final pretrial. I don't think we'll have time to address that, so we'll set it for a hearing next week." After the attorneys informed the court that they would be unavailable at that time, the court indicated that it would find another date to address [the petitioner's] request. It added, "You have a Constitutional right to represent yourself, but I have to make

2

that decision as to whether you're capable of doing so and I may have to do it on the morning of trial.

The circuit court attempted to address [the petitioner's] request to represent himself on the first day of trial, June 23, 2014. However, [the petitioner] refused to come to court and was eventually brought into the courtroom in his jail clothes. [The petitioner] would not fill out the waiver-of-counsel form or answer any of the court's questions about whether he was waiving counsel or was competent to represent himself. Instead, he offered such nonsensical observations as, "Maritime law is being forced upon me," and "I am the authorized representative and the legal beneficiary of this estate." The court determined that [the petitioner] was not attempting to proceed pro se and could not proceed pro se.

The next day, [the petitioner] again told the circuit court that he wanted to represent himself. The court gave [the petitioner] the waiver-of-counsel form, and he filled it out. The court then conducted an extensive colloquy with [the petitioner]. Based upon the colloquy, the court did not believe that [the petitioner] had made a deliberate choice to proceed without counsel and was aware of the difficulties and disadvantages of self-representation. Similarly, it did not believe that [the petitioner] was competent to represent himself, as he did not demonstrate a basic understanding of the criminal justice system. Accordingly, it denied [the petitioner's] request.

At trial, the jury viewed a surveillance video that showed [the petitioner] and the victim entering a motel room. It heard from the victim, who accused [the petitioner] of sexually assaulting her there. Likewise, it heard from a sexual assault nurse, who examined the victim and concluded that her physical injuries were consistent with sexual assault. The State also presented evidence of [the petitioner's] evasive conduct after the assault. Additionally it presented testimony from a DNA analyst who analyzed samples taken from the victim and opined that [the petitioner's] DNA was on the victim's underwear, toilet tissue in her underwear, and in her anus. The forensic program technician who initially screened the samples did not testify.

Ultimately, the jury found [the petitioner] guilty on all counts.

Dkt. No. 11-2 at 2-4.

The petitioner filed a postconviction motion, arguing that he (1) was improperly charged; (2) was denied the right to self-representation; and (3)

3

received ineffective assistance of counsel. Id. at 4. The court denied the motion, and the petitioner appealed.

The Wisconsin Court of Appeals affirmed the conviction. State v. As-Saffat, Appeal No. 2017AP2084-CR, 2020 WL 1160975, *2 (Wis. Ct. App. 2020). First, the court rejected the argument that the State improperly had reissued the charges after the dismissal of Case Nos. 2013CF4277 and 2013CF4303. Id. at *2. The court found that Wis. Stat. §970.04, which "forbids reissuance of a complaint if the evidence presented at a preliminary hearing was insufficient, unless the state comes forward with new or previously unused evidence," did not apply because neither of the petitioner's prior cases were dismissed at a preliminary hearing due to insufficient evidence. Id. (quoting State v. Hoffman, 106 Wis. 2d 185, 196 (Wis. Ct. App. 1982)). The court explained that the first case had been dismissed prior to the preliminary hearing because of a technical error, and the second case had been dismissed at trial because of the unavailability of the witness—*after* the petitioner had waived the preliminary hearing. Id.

As for the petitioner's argument that he was denied the right to represent himself because the trial court did not immediately hold a hearing on his request at the final pretrial conference, the Wisconsin Court of Appeals concluded that the circuit court had not erred. Id. at *3. The court observed that the trial court judge had insufficient time at the pretrial hearing, had tried to schedule another hearing the following week (which had proved unsuccessful) and had resolved to address the matter the first day of trial. Id.

4

The court determined that the petitioner's refusal to cooperate on the first day of trial was not the trial court's fault, that the court then had denied the motion on the merits and that there was no reason to believe that the result would have been different had the colloquy been conducted at the final pretrial hearing. Id.

The Wisconsin Court of Appeals similarly rejected the petitioner's claim that he received ineffective assistance when his trial counsel failed to call the forensic program technician who initially screened the samples taken from the victim. Id. Citing Strickland v. Washington, 466 U.S. 668 (1984), the court began its analysis with Wisconsin's requirement that an individual pursuing postconviction relief based on trial counsel's ineffective assistance must preserve counsel's testimony in a postconviction hearing. Id. (citing State v. Curtis, 218 Wis. 2d 550, 554-55 (Wis. Ct. App. 1998)). The court explained that to earn a hearing on a postconviction motion, State v. Allen, 274 Wis. 2d 568 (Wis. 2004), requires a defendant to allege sufficient facts that, if true, would entitle him to relief. The Wisconsin Court of Appeals was not persuaded that the petitioner was entitled to a hearing. Id. The court pointed out that the petitioner did not present an affidavit from the forensic program technician detailing what he would have said had he been called and that there was no reason to believe his testimony would have helped the defense. Id. The court also pointed out that, although the petitioner had "ma[de] much of the fact" that the technician's report did not show the presence of semen on swabs taken from the victim, the "same report revealed the presence of micro sperm

5

on a vaginal smear from the vaginal swabs and on an anal smear taken from the anal swabs," so "there was genetic material to test and the DNA analyst was able to link what she tested to [the petitioner]." Id. Based on this fact and the other strong evidence of the petitioner's guilt, the court of appeals found that there was no reasonable probability that the petitioner had been prejudiced by counsel's alleged error. Id.

Finally, the court addressed the petitioner's argument that he was entitled to a new trial in the interest of justice under Wis. Stat. §752.35, "which allows [the court of appeals] to reverse a judgment 'if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried.'" Id. The court concluded that the petitioner was not entitled to a new trial because it already had determined that there was no error and it "was not persuaded that the "real controversy was not fully tried or that justice miscarried." Id. at *4.

The Wisconsin Supreme Court denied the petitioner's petition for review. Dkt. No. 11-3.

B.      Federal *Habeas* Petition (Dkt. No. 1)

In his federal petition, the petitioner raises four grounds for relief: (1) he was denied his right to self-representation in violation of the Sixth and Fourteenth Amendments; (2) his counsel was ineffective in failing to locate, interview and investigate the DNA evidence and in failing to introduce expert testimony and a DNA report to support his defense; (3) reissuing the charges violated his rights under state law and the Fourth, Fifth, Sixth, Eighth and

6

Fourteenth Amendments; and (4) the State violated his right to a speedy trial under Wis. Stat. §971.10(4) and the Sixth and Fourteenth Amendments. Dkt. No. 1.

According to the respondent, the state court did not unreasonably apply federal law with respect to the petitioner's right to self-representation or ineffective assistance of counsel. Dkt. No. 18 at 2. The respondent explains that the petitioner never challenged the circuit court's rulings that he did not knowingly, intelligently and voluntarily request to represent himself or that he was not competent to do so. Id. at 13. The respondent says that the petitioner challenged only the timing of the court's decision on his motion and that, on that point, the state court's ruling was not an unreasonable application of federal law. Id. at 16. The respondent further argues that neither of the state statutory claims are cognizable on *habeas* review and that the petitioner has procedurally defaulted any argument about speedy trial rights because he did not exhaust that claim in the state courts. Id.

## II.   Analysis

### A.   *Habeas* Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765

F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §§2254(d)(1), (2)). A federal *habeas* court reviews the decision of the last state court to rule on the merits of the petitioner's claim. <u>Charlton v. Davis</u>, 439 F.3d 369, 374 (7th Cir. 2006).

"'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003) (emphasis added). In other words, §2254(d)(1) allows a federal court to grant *habeas* relief only where it determines that the state court applied federal law in an "objectively unreasonable" way. <u>Renico</u>, 559 U.S. at 773.

"A state court's determination that a claim lacks merit precludes federal *habeas* relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). This standard is both "difficult to meet" and "highly deferential." <u>Saxon v. Lashbrook</u>, 873 F.3d 982, 987 (7th Cir. 2017) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)).

## B.    Right to Self-Representation

### 1.    *Parties' Arguments*

The petitioner argues that he was denied the right to represent himself in violation of Faretta v. California, 422 U.S. 806 (1975). Dkt. No. 1 at 7, 9. His arguments have evolved since his filings in the state courts, so the court will begin with the arguments raised in his petition. The petitioner asserts that his "[p]ro se assertion's [sic] at the Final Pretrial were unlawfully denied while having not been advised of the difficulties and disadvantages of Self-Representation, and denial not based on any alleged mental illness or disability." Id. at 11. He then argues that on the first day of trial, his "unwanted counsel" "moved the court to have Petitioner chained to a wheelchair in handcuffs, leg irons and a 50 thousand volt stun device strapped to his leg." Id. The petitioner says that his "repeated rejection of unwanted counsel moved the court to order a continuous objection" against the attorney. Id. The petitioner says that on the second day of trial he raised the issue of standby counsel and the court denied his request. Id. at 12. The petitioner claims that he "knowingly, intelligently and voluntarily filled out a 'Waiver of the right to an attorney form.'" Id. at 13. But he says that "the court 'was willing to overlook' the waiver and find" he had not knowingly, intelligently and voluntarily waived his right to counsel. Id. The petitioner argues that despite this, the trial judge allowed him to represent himself at sentencing. Id. at 14.

In his supplemental brief, the petitioner argues that the circuit court forced him to proceed with unwanted counsel for the duration of the final

pretrial proceedings in violation of <u>Faretta.</u> Dkt. No. 13 at 5. The petitioner focuses on day two of the trial, when his attorney "abandoned the defense table to advise and warn the prosecutor that the judge [was] wrong about standby counsel and that judge [was] setting the State's case up for reversal." <u>Id.</u> at 6. He argues that, according to <u>Faretta</u>, a state may appoint standby counsel "to aid the accused if and when the accused requests help." <u>Id.</u> He argues that it was unreasonable for the court to grant his requests to represent himself after the trial. <u>Id.</u> at 7. He reminds the court that this is not a harmless error analysis. <u>Id.</u>

The respondent points out that "[the petitioner] did *not* challenge the circuit court's rulings that: (1) he did not knowingly intelligently, and voluntarily request to represent himself; and (2) even if he did he was not competent to do so. Rather [the petitioner] challenged only the *timing* of when the circuit court addressed his request to represent himself." Dkt. No. 18 at 13 (emphasis in original, citations to record omitted). The respondent says that to the extent that the petitioner now is challenging the merits of the decision denying his request to represent himself, those claims are unexhausted because he did not fairly present that claim for a full round of review. <u>Id.</u> at 16.

The respondent maintains that the Wisconsin Court of Appeals did not unreasonably apply <u>Faretta</u> when it determined that the petitioner's right to self-representation was not violated by the court's timing in addressing the request. <u>Id.</u> at 16. According to the respondent, the court of appeals noted that the trial court did not have sufficient time when the petitioner initially made

10

the request and that it attempted to address it at the next opportunity, prior to trial, but that the petitioner refused to participate. Id. The respondent says that there is nothing in Faretta that requires a circuit court to conduct a colloquy "the instant" a defendant requests it. Id.

The respondent argues that any error in delaying a ruling was harmless because the trial court concluded that the petitioner was not making a knowing, intelligent or voluntary choice to represent himself. Id. at 17. The respondent says that the petitioner never challenged the correctness of that decision and argues that he cannot do so now. Id. The respondent cites the petitioner's highly disruptive behavior and his statements implicating competence, recounting that the petitioner "repeatedly demanded that the trial judge read his name into the record and cite various pledges," "repeatedly sat mute while the court attempted to ask him questions" and said his case had been tried three times already, that he was being tried under federal Maritime law and that the case had been "settled." Id. at 18-19. The respondent says that at one point, the petitioner sought to have his attorney arrested for violating the "Separation of Powers Act" and nonsensically stated he was "the living beneficiary of this estate." Id. at 19. According to the respondent, this reflects "not just a mere lack of technical legal knowledge but an inability to comprehend what was actually happening in the courtroom." Id.

In his reply brief, the petitioner argues that the trial court would have had plenty of time to address his request at the final pretrial conference because he made efforts to get rid of his attorney "towards the middle of the

11

Final Pretrial hearing." Dkt. No. 21 at 1, 3. He believes that once he asserted his right, the trial court should have "cease[d] other business and made the required inquiry." Id. He argues that any delay in conducting the inquiry is at odds with the "spirit of **Faretta**." Id. at 4 (emphasis in original). He says that although his behavior on the first day of the trial reflected "conduct of nonacceptance," he clearly waived his right to a lawyer on day two but the court still denied his request. Id. at 5-6. He adds that the denial of standby counsel compounded the error, and that the Wisconsin Court of Appeals failed to address Supreme Court precedent. Id. at 6-7.

2. *Governing Law*

Criminal defendants have a right to self-representation. Faretta, 422 U.S. 806. For a defendant to waive his constitutional right to counsel, he first must "'clearly and unequivocally' raise the right to self-representation." United States v. Mancillas, 880 F.3d 297, 301 (7th Cir. 2018) (citing Faretta, 422 U.S. at 835). "Courts have required an unequivocal assertion of the right to self-representation in order to prevent a defendant from using an ambiguous waiver of the right to counsel as a tool to overturn his or her conviction." Id. (citing United States v. Campbell, 659 F.3d 607, 612 (7th Cir. 2011), vacated on other grounds, *sub nom.*, Campbell v. United States, 568 U.S. 802 (2012)).

When a competent defendant clearly and unequivocally has asserted his right to represent himself in a timely manner and when the court has determined that the waiver of the right to counsel was intelligent and voluntary, "a trial court may not deny it." United States v. Banks, 828 F.3d

12

609, 614 (7th Cir. 2016) (citing <u>Imani v. Pollard</u>, 826 F.3d 939, 943-45 (7th Cir. 2016)). A court's determination of whether a defendant's waiver of the right to counsel is intelligent and voluntary "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." <u>Zerbst</u>, 304 U.S. at 464. Although a defendant may waive his right to counsel even if he "may ultimately conduct his own defense to his detriment," <u>id.</u> (quoting <u>United States v. Avery</u>, 208 F.3d 597, 601 (7th Cir. 2000)), the court still must make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open," <u>id.</u> (citing <u>Faretta</u>, 422 U.S. at 835). The court considers the entire record in determining whether a defendant knowingly and intelligently waived his right to counsel. <u>Faretta</u>, 422 U.S. at 835.

Wisconsin courts consider similar factors. In <u>State v. Klessig</u>, 211 Wis. 2d 194, 206 (Wis. 1997), the Wisconsin Supreme Court mandated that a trial court must conduct a colloquy "in every case where a defendant seeks to proceed pro se to prove knowing and voluntary waiver of the right to counsel."

> To prove such a valid waiver of counsel, the circuit court must conduct a colloquy designed to ensure that the defendant: (1) made a deliberate choice to proceed without counsel, (2) was aware of the difficulties and disadvantages of self-representation, (3) was aware of the seriousness of the charge or charges against him, and (4) was aware of the general range of penalties that could have been imposed on him.

<u>Id.</u> (citing <u>Pickens v. State</u>, 96 Wis. 2d 549, 563-64 (Wis. 1980) (partially overruled by <u>Klessig</u>)).

13

### 3. *Discussion*

Before addressing the petitioner's claim, the court first must clarify what the petitioner raised—and did not raise—on appeal. While representing himself on appeal, the petitioner argued that at the final pretrial conference, the circuit court judge denied his repeated requests to proceed *pro se*. Dkt. No. 11-4 at 9. The petitioner argued that the circuit court judge ruled that the final pretrial conference would go on with counsel "instead of responding directly or promptly launching the necessary Faretta-based inquiry." Id. at 45. He argued that by failing to rule at the final pretrial conference, the circuit court violated his Sixth Amendment right to representation. Id. at 47, 48. The petitioner further argued that he could show prejudice because he was deprived of his right to communicate a possible defense to the jury and asserted that he would have performed better than trial counsel. Id. at 49.

In his petition for review to the Wisconsin Supreme Court, the petitioner did not discuss the circuit court's Faretta inquiry on days one and two of trial. Instead, the petitioner wrote:

> [The petitioner's] Post Conviction Motion, claiming a Faretta violation at the final pretrial proceedings on 6/13/2014 was not directly addressed in the assistant district attorney's PC response brief or PC court's decision. Under appeal, the assistant attorney general conceded that the invocation of [the petitioner's] rights to proceed pro se was in fact violated at the final pretrial stage, but argued that the weight of the judges failure was "harmless error", and should fall on [the petitioner] for not accepting an invitation to renew his Faretta motion in the future. The Court of Appeals affirmed the circuit court's denial. A motion for reconsideration was also denied.

Dkt. No. 11-6 at 5. The petitioner argued that "[w]hether or not a court may deny a Faretta inquiry because the judge wants to finish pretrial proceedings with court appointed attorney for the convenience of time, and instead offers to hear the Faretta invocation in the near future, is an important question which this Court must address to ensure that parties are aware of what will and will not happen once an unequivocal requests to self-representation is invoked." Id. at 7 (as in original). The petitioner argued that this issue likely would reoccur unless this court provides clarification. Id. He pointed out that the circuit court had allowed him to proceed without counsel at sentencing, id. at 23-27, but again he did not challenge the colloquies or decisions during trial. He focused solely on the timing of the court's decision and the court's alleged failure to address his request immediately at the time of the final pretrial conference. Id.

So, the question for this court is whether the Wisconsin Court of Appeals' decision—on the issue the petitioner raised before that court—reflected an unreasonable application of clearly established Sixth Amendment rights or was otherwise based on an unreasonable determination of the facts. The court of appeals resolved the petitioner's claim as raised in his appellate brief: that the circuit court erred by finishing the final pretrial conference without holding a hearing on his request to proceed without counsel. Dkt. No. 11-4 at 48 (arguing that the court's decision to finish the final pretrial conference first was a constructive denial). The court of appeals made clear that the petitioner did *not* argue that the circuit court had erred when it reached the *merits* of his motion. As-Saffat, 2020 WL 1160975, *3. The court wrote:

15

> Defendants have the right to conduct their own defense under both the United States Constitution and the Wisconsin Constitution. *State v. Klessig*, 211 Wis. 2d 194, 203, . . . (1997). Whether a defendant's constitutional right to self-representation has been violated is a question of law that we review de novo. *State v. Darby*, . . . 317 Wis. 2d 478.
>
> We cannot say that [the petitioner's] right to self-representation was violated by the circuit court's failure to immediately hold a hearing on his request to represent himself. As noted, the court determined that there was insufficient time to do so at the final pretrial hearing. It tried to schedule another hearing the following week and then, when that proved unsuccessful, resolved to address the matter the first day of trial. The fact that [the petitioner] chose to be uncooperative that day was not the court's fault. In any event, the court eventually denied the request on the merits. There is no reason to believe that the court would have reached a different decision had it addressed the request at the final pretrial hearing.

Id.

The court of appeals acknowledged that the right to self-representation exists under both the United States and Wisconsin Constitutions. The petitioner argues that the court erred by not citing Faretta, but the circuit court cited Klessig, which accurately cites to the Sixth Amendment and to Faretta and requires that a trial court allow a defendant to represent himself where the defendant has knowingly, intelligently and voluntarily waived the right to counsel and is competent to proceed *pro se*. Klessig, 211 Wis. 2d at 202. More important, the petitioner has failed to identify language in Faretta or any other controlling authority that required the trial court to immediately halt proceedings and conduct the Faretta colloquy the minute he made the request.

The Wisconsin Court of Appeals' ruling does not unreasonably apply Faretta because the circuit court did not deny the petitioner's request at the final pretrial hearing and the petitioner did not renew his request when given

16

the opportunity at the start of trial or otherwise participate in the court's attempted colloquy. In this respect, the facts of this case are distinguishable from the case cited by the petitioner, Imani v. Pollard, 826 F.3d 939 (7th Cir. 2016). In Imani, the defendant invoked his right to represent himself before trial. Id. at 942. Before denying the motion, the state circuit court judge asked him, "What do you want to say to me to convince me that you're competent to represent yourself?" Id. The judge found that the defendant "did not have a 'sufficiently rational basis' to justify the decision," and described the defendant's decision as a "flippant short term or immature decision" and "episodic driven, stemming from the loss of his suppression motion." Id. The court explained that it wanted to keep the trial schedule but indicated that it would entertain a future request. Id. The Wisconsin Court of Appeals reversed and ordered a new trial, but the Wisconsin Supreme Court affirmed the conviction. Id. at 943. The Seventh Circuit reversed. Id.

The Seventh Circuit found that the Wisconsin Supreme Court's decision violated Faretta in three ways. First, the circuit court put the burden on the defendant to persuade the court that that he was making a knowing and voluntary decision. Id. at 944. Second, the circuit court required the defendant to give a "good" reason for choosing self-representation, when the defendant's reason is immaterial. Id. Third, the circuit court imposed a more demanding competence standard than Faretta when there was no mental illness or impairment that might have rendered the defendant incompetent. Id. The Seventh Circuit emphasized that a judge may deny the exercise of self-

17

representation when a defendant "invokes the right so late as to delay a trial or engages in 'serious and obstructionist misconduct," but the timing of the request does factor into the competence analysis. Id. Finally, in a footnote, the Seventh Circuit explained that a denial was a denial regardless of whether the court says that it will entertain a request to reconsider the decision in the future. Id. at 947, n.1.

The court has carefully reviewed the record here, including the transcripts from the final pretrial conference and the trial. The final pretrial conference transcript is 109 pages, which is relevant because of where the petitioner claims to have first asserted his right. At page 66 (over halfway in), the petitioner asked his attorney to withdraw, but he did *not* ask to proceed without counsel. Dkt. No. 11-7 at 66. It wasn't until closer to the end of the hearing that the petitioner first requested to represent himself. Id. at 85. The circuit court judge responded: "I'll tell you what we're going to do, we'll finish the final pretrial. I don't think we'll have time to address that, so we'll set it for hearing next week." Id. When both the prosecutor and defense counsel said that they would be out of town the next week, the court observed that the petitioner was making "incredible statements" but acknowledged that he had a constitutional right to defend himself. Id. at 86. At that point, the court denied defense counsel's motion to withdraw, finding that the statements made by the petitioner in support of the motion were untrue. Id. at 88. The court said it separately would determine whether the petitioner could represent himself after it finished the final pretrial conference. Id. at 89. The petitioner began to

demand that the judge state his name so that he would know who he was talking to, id. at 90, then asserted that he was the living beneficiary of "this estate," id. at 92. The petitioner rejected the plea offer, id. at 102, then the court said that it would have to "grab something quick" to address the motion to proceed *pro se* or address it on the morning of trial. Id. at 108. Defense counsel asked to address the request the morning of trial. Id.

Trial began on June 23, 2014, and the petitioner was not willing to engage. Dkt. No. 11-15. The circuit court judge summarized what had transpired:

> Matter is set for jury trial today. The bailiffs went back to bring [the petitioner] in the courtroom. He refuses to come into the courtroom. He has made comments that the case is settled, he doesn't have an attorney and so he's not coming.
>
> I asked the bailiffs to go back and advise him that he needs to come into the courtroom to explain that. Again, he refuses to come in. I then asked the bailiffs to go back and say, remind him at his last court appearance he made the statement that he wanted to represent himself and that he would have to come in the courtroom again to make that request. That his response again was that it is – the case is settled and that he's not coming into the courtroom.

Id. at 2. Defense counsel told the court that he had tried to speak to the petitioner, but that the petitioner had called for counsel's arrest and told counsel that he had violated the Separation of Powers Act. Id. at 4. Counsel said he tried to give the petitioner a Waiver of Attorney form, but the petitioner had refused. Id. The court responded:

> All right. And the record does reflect at the last court appearance there were numerous motions that the Court ruled upon and [the petitioner] immediately became upset and angry because Mr. Harris didn't prevail on those motions including a motion to dismiss and was very agitated and then began making comments to the effect he

19

wanted to represent himself, Mr. Harris was not his lawyer, and then made some other general comments about his being the personal representative or something of his estate and that he was not going to cooperate. The Court warned him he would be removed from the courtroom and he continued to be disruptive. The record will reflect that.

He did file on June 20, he got filed a document called court bond and this is probably where he is making his argument that the case is resolved. It says in the interest to resolve disputes, I [the petitioner], is the living beneficiary and authorized representative of the [petitioner's] estate, submit this instrument and request the court to dismiss the above captioned case and discharge the debt thereby ending the controversy of discharging any obligation that might be to get an assessment in fact.

Additionally, move the court into post-settlement of closure of his account by the use of my exemption as principal in that this count is prepaid and exempt from levy, therefore, balance, the imbalance due on the private or public side backed by my exemption. And it has some other language in it. Except for the word value, return to the value, use my exemption as principal as this account is prepaid and exempt from levy. Gives an exemption number and UCC numbers and it is signed by the [petitioner].

Id. at 5-6.

When the petitioner finally appeared in the courtroom, he repeatedly demanded that the judge read his name into the record and pledge to uphold the United States and Wisconsin Constitutions and his oath of office. Id. at 7-8. The petitioner asked that the case "be changed to a federal venue because at this point in time [he was] being forced with Maritime law." Id. at 8. The petitioner told the judge that the case had been resolved: "It's been resolved. I am the authorized representative and the beneficiary of this property, and if you can't state your name for the record, sir, I'm going to remain silent because I don't know who I'm in front of right now. I don't know who I'm talking to." Id. at 8-9. The judge humored the petitioner and stated his name. When asked if

20

he was ready for trial, the petitioner responded, "There is—there is no trial. This matter has been settled." Id. at 9. He stated that he did not "accept anything that's going on in this—in this courtroom." Id. at 10. When defense counsel asked the court to explain to the defendant his options, the defendant asked to have counsel arrested. Id. at 11. The following exchange took place:

> THE COURT: At this moment, at an earlier court date you said you wanted to represent yourself. Today you're not indicating whether you want to represent yourself. You're saying this case is over and you're not going to participate.
>
> First of all, as to the case being over, it's not over. It's set for trial. We are going to proceed to trial today and the options are that Mr. Harris represents you. You can ask the Court to be allowed to represent yourself. There is some very specific rulings that I will have to make under the circumstances.
>
> And if Mr. Harris is representing you, you have the right to be in court with him. You have the right to—
>
> [THE PETITIONER]: He does not represent me. He does not represent me and I won't accept anything that's going on in this court. I am the authorized representative and the legal beneficiary of this estate.
>
> THE COURT: All right. So you're not asking me to allow—
>
> [THE PETITIONER]: Without prejudice. 1-207/308 UCC.

Id. at 11-12. The petitioner then asked to have defense counsel removed from the courtroom. Id. at 13. The court again explained that the petitioner had the right to ask the court to allow him to proceed without counsel:

> You have the right to ask the court to represent yourself and there is an analysis that I have to go through. There is language spelled out by our Wisconsin Supreme Court and it discusses the U.S. Supreme Court cases, and I have to make specific findings as to whether or not you're making that—first of all, you're not asking the court to do it, and secondly, as to whether or not under the circumstances it should be granted. But at the moment, you're not making the request.

21

Id. at 13.

Again, the court asked the petitioner whether he was asking the court to proceed without counsel and the petitioner responded: "I'm not asking anything from this Court but to have the case dismissed." Id. at 16. The court denied the request to dismiss the case and again asked the petitioner whether he wanted to represent himself. Id. at 16. The petition responded: "I'm not asking anything of anyone. I don't have to. I am the living. I own this property, I own this property. I don't; have to ask anyone about my property, about the property that I own." Id. at 17. When the court asked if the petitioner was willing to fill out the form to waive his right to counsel, the petitioner refused to respond. Id. at 18.

The court then explained that every defendant has a fundamental right to the assistance of counsel and an equally fundamental right to represent himself. Id. at 23-24. The court accurately summarized the controlling authority and discussed the need for the court to find a knowing, intelligent and voluntary waiver through a colloquy designed to ensure that the petitioner had made a deliberate choice. Id. The court asked the petitioner about his age, his years of schooling, his ability to read or write English, whether he had taken medication or suffered from any physical or psychological disabilities that would impact his ability to understand what was happening in court and to communicate his positions on the case and whether he understood his right to have counsel at all stages or hire his own. Id. at 26. The petitioner refused to answer any of the court's questions. Id. at 26. He again asked the judge

22

whether the judge had pledged to uphold the United States and Wisconsin constitutions and insisted that the case had been settled—"squared away." Id. at 27. The court next asked whether the petitioner understood that an attorney would advise him of his legal rights, assist him with legal and court procedures, investigate defenses, prepare and conduct a defense, file motions, present evidence and assist the defendant at sentencing if there is a conviction. Id. at 27-29. The petitioner remained silent throughout the court's questions. Id. The court found that the petitioner had not made a request to represent himself and that the court couldn't "proceed to determine" whether the petitioner was "knowingly intelligently voluntarily waiving his right to be represented by a lawyer." Id. at 29-30.

Based on these facts, the Wisconsin Court of Appeals did not unreasonably apply Faretta. This was not a case where the circuit court denied the petitioner his right to counsel at the final pretrial conference, with some future promise that the petitioner could raise the issue again. This was not a case where the circuit court imposed a stricter burden than that described in Faretta or conflated a lack of good reasons with competence.

In his *habeas* petition, the petitioner first raised the circuit court's rulings on the merits of the motion on days one and two of the trial, and argued that it was "unreasonable for the court to grant his requests to proceed pro se after trial." Dkt. No. 13 at 6, 7. But federal *habeas* relief is available to state prisoners only after they have exhausted their claims in state court. 28 U.S.C. § 2254(b)(1), (c). Exhaustion of state remedies is required as a

23

prerequisite to the consideration of each claim the petitioner seeks to present in a federal *habeas* petition. Picard v. Connor, 404 U.S. 270, 275-76 (1971). Exhausting all state remedies includes presenting each claim on appeal to the Wisconsin Court of Appeals and in a petition for discretionary review to the Wisconsin Supreme Court. See Morgan v. Buesgen, Case No. 24-cv-0933, 2025 WL 472338, at *2 (E.D. Wis. Feb. 12, 20225) (explaining the exhaustion requirement under §2254). To properly exhaust a claim and "avoid procedural default, a habeas petitioner must 'fairly present' a claim to each level of the state courts." McDowell v. Lemke, 737 F.3d 476, 482 (7th Cir. 2013) (quoting Anderson v. Benik, 471 F.3d 811, 814 (7th Cir. 2006)).

The petitioner chose to represent himself at sentencing and on appeal. He had the opportunity to fully and fairly present all his claims to the Wisconsin courts. Because he failed to do so, he has procedurally defaulted. A petitioner seeking review of defaulted claims has two options. He can show "cause and prejudice for the default" or he can demonstrate that failure to consider the defaulted claims will result in a "miscarriage of justice." Promotor v. Pollard, 628 F.3d 878, 885 (7th Cir. 2010) (citation omitted). The Seventh Circuit has explained "cause" as follows:

> "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded" compliance with the procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 . . . (1986). This normally means petitioner must "show[ ] that the factual or legal basis for a claim was not reasonably available," or "that 'some interference by officials[ ]' … made compliance impracticable." *Id.* (quoting *Brown v. Allen*, 344 U.S. 443, 486 . . . (1953)); *see also Garcia v. Cromwell*, 28 F.4th 764, 775 (7th Cir. 2022) (quoting *Thompkins v. Pfister*, 698

24

F.3d 976, 987 (7th Cir. 2012)) ("Cause requires a showing of 'some type of external impediment' that prevented [petitioner] from presenting his claims.").

Love v. Vanihel, 73 F.4th 439, 446-47 (7th Cir. 2023).

The petitioner has made no attempt to show that some external impediment interfered with or prevented him from presenting all of his claims. The petitioner filed a supplemental brief, dkt. no. 13, a reply, dkt. no. 21, a declaration, dkt. no. 22, letters, dkt. nos. 24-26, and a "re-typed" reply, dkt. no. 27. Not once did the petitioner identify "something that [could not] be fairly attributed to" him. See Johnson v. Foster, 786 F.3d 501, 506 (7th Cir. 2015). He drafted his own appeal. He drafted the petition for review that he filed with the Wisconsin Supreme Court. There is nothing in this record to suggest that interference by state officials made it impossible for him to comply with a procedural rule.

The petitioner similarly has failed to demonstrate that the failure to consider his claims will result in a miscarriage of justice. "The miscarriage-of-justice exception to procedural default requires the petitioner to make a convincing showing of actual innocence." Jones v. Calloway, 842 F.3d 454, 461 (7th Cir. 2016) (citing McQuiggin v. Perkins, 569 U.S. 383, 392 (2013)). "A credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." McQuiggin, 569 U.S. at 392.

> To pass through the actual-innocence gateway to a merits review of a procedurally barred claim, the petitioner must have new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that

> was not presented at trial, and must persuade the district court that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.

Jones, 842 F.3d at 461 (internal citations and quotations omitted). "New evidence" does not mean "newly discovered evidence," but rather evidence that was not presented to the jury at trial. Id.; see also Gladney v. Pollard, 799 F.3d 889, 896 (7th Cir. 2015) (a claim of actual innocence is only viable if the evidence was not previously considered by the jury). In the context of arguing his ineffective assistance of counsel claim, the petitioner has said that he would have called the technician who conducted the initial DNA tests. But he has not provided any evidence regarding what the technician would have said if called, nor has he explained how that would have demonstrated his actual innocence.

The Wisconsin Court of Appeals' decision was a reasonable application of the Sixth Amendment and Faretta, and the petitioner had procedurally defaulted on his attempt to challenge the circuit court's denial of his motion to represent himself.

### C. Ineffective Assistance of Counsel

#### 1. *Parties' Arguments*

Next, the petitioner argues that his counsel was ineffective in failing to "locate, interview, investigate DNA evidence" or otherwise introduce expert testimony and DNA report in his defense. Dkt. No. 1 at 8. The petitioner asserts that testimony from the Wisconsin State Crime Lab Analyst Troy Chadwick would have exonerated him because lab reports show that the vaginal swabs

26

Case 2:21-cv-01241-PP   Filed 06/30/26   Page 26 of 45   Document 32

and anal swabs of the victim were negative. Id. at 9. He accuses the State Crime Lab witness, Patricia Dobrowski, of lying about the negative results. Id. at 9, 18. The petitioner says that this testimony swayed Juror No. 3, who asked why they had not already found the petitioner guilty when there was positive DNA. Id. at 10, 18. According to the petitioner, counsel's ineffectiveness was highlighted when he came to the final pretrial conference unprepared and without a witness list, failed to interview Chadwick and allowed the state to say that Chadwick didn't conduct testing. Id. at 10. The petitioner argues that without Chadwick, he had no defense. Id. at 11. He argues that

> [i]n the most basic sense, Chadwick's proposed testimony would have shown to the jury that he actually reported something different from what Dobrowski described to the jury. In this regard, the truth of the matter regarding Dobrowski's testimony really did not matter. What matter [sic] is the difference between what Chadwick initially reported as fact for the State, and what Dobrowski subsequently reported what Chadwick reported as fact for the State.

Id. at 20. The petitioner believes that Chadwick's testimony and his DNA report would have been "entirely consistent with [the petitioner's] claim he didn't have sex with the accuser, and that the accuser made false claims because she feared more abuse from her mother." Id.

The petitioner also appears to assert that he was denied discovery because the court believed discovery was produced in the first case even if it was not produced in the subsequent cases. Id. at 16. The petitioner claims that without Chadwick's report, it was "unknown" to him at the final pretrial that "DNA materials generated by Chadwick were 'negative for the presence of semen'" and that all other materials were inconclusive. Id. at 17. At the same

27

time, the petitioner argues that even if this court agrees with the court of appeals that Dobrowski's report was sufficient, counsel still was deficient because Chadwick's testimony would have impeached Dobrowski. Id. at 21. The petitioner maintains that there were only two anal swabs and both were inconclusive. Id. at 22.

In his supplemental brief, the petitioner argues that counsel failed to comply with the "contract/agreement" that he signed with the prosecutor to retain an expert to review the state's DNA report. Dkt. No. 13 at 10. He argues that at the final pretrial conference, defense counsel failed to submit a jury instruction about the petitioner's theory of defense. Id. at 11. According to the petitioner, the failure to subpoena Chadwick or add him to the witness list denied him of his right to compulsory process. Id. at 12. He maintains that the vaginal and anal swabs were negative, but that Dobrowski testified that Chadwick did the initial stain analysis and the confirmatory tests. Id. at 16.

The respondent argues that the Wisconsin Court of Appeals reasonably applied Strickland's two-prong test when it addressed the petitioner's claim of ineffective assistance. Regarding the first prong—that the petitioner must prove his counsel's performance was deficient—the respondent argues that the court reasonably concluded that the petitioner could not prove his trial counsel's performance was deficient. The respondent asserts that the petitioner cannot prove deficient performance because all relevant DNA evidence was admitted, and suggests that the petitioner's arguments about contradictions between Chadwick's and Dobrowski's findings are based on a misunderstanding of

28

those findings. Dkt. No. 18 at 22-23. The respondent says that Dobrowski explained that Chadwick had performed an initial screening/presumptive test, which is a fast "color change test" that commonly shows an inconclusive result. Id. at 23. The respondent says that Dobrowski explained that she then performed a more involved, confirmatory test that uses a chemical process to separate sperm cells from other cells and that it is common for this test to show a conclusive result when the initial screening did not. Id. at 23. The respondent points out that the petitioner did not present an affidavit from Chadwick or explain what Chadwick would have said had he testified. Id. at 23. For this reason, and because Chadwick's and Dobrowski's results were consistent, the respondent says that the court of appeals found no reason to believe that Chadwick's testimony would have helped the defense. Id. at 24. The respondent adds that the petitioner has shown no reason that having his own DNA expert hired by his counsel would have helped his defense. Id. at 24.

As for the second prong of Strickland—that the petitioner must prove he suffered prejudice because of his counsel's deficient performance—the respondent says that the Wisconsin Court of Appeals determined that the petitioner could not prove prejudice. Id. The respondent argues that the decision was reasonable because Chadwick's report actually revealed "the presence of micro sperm on a vaginal smear taken from vaginal swabs and on an anal smear taken from anal swabs" and positively identified semen in the victim's underwear. Id. at 25. DNA testing showed the petitioner's sperm in the victim's anus and underwear. Id.

29

The respondent states that beyond the DNA evidence, the evidence of the petitioner's guilt was overwhelming: the victim testified and detailed what the petitioner had done to her; the victim had blunt force injuries to her vagina consistent with sexual assault; the jury saw video evidence of the petitioner and the victim together at his hotel; and the petitioner fled from police, hid for four days, locked himself in a furnace room and resisted arrest. Id. at 25. According to the respondent, the petitioner "did himself no favors" by testifying that despite finding the victim in her own neighborhood, "he took her on a three-mile journey to his hotel room" because he was a "protector." Id. at 26. The respondent says that the petitioner implied that the victim "dug up a used condom from inside his room and intentionally placed his semen in her anus and underwear." Id. The respondent states that the petitioner told the jury—over the court's admonishments—that the case had been tried three times before and admitted that he previously had been convicted of eight crimes. Id. The respondent argues that given all this evidence, the court of appeals "reasonably concluded that calling Chadwick and/or another DNA expert would not have created a reasonable probability of a different outcome." Id.

The petitioner replies that it is "absolutely not the truth" that "Chadwick does the initial screening/presumptive and Dobrowski does the confirmatory tests." Dkt. No. 21 at 9. The petitioner believes that Chadwick used the total amount of anal swabs available for testing and that would have prevented any other analyst from testing the samples. Id. He accuses the state of lying about the presence of micro sperm on the smear because Chadwick's report only

30

refers to microsperm on the vaginal smear and the toilet paper but the anal swab and smear were negative for the presence of semen. Id. at 10. The petitioner argues that this is a lie, a fabrication and "felony perjury." Id. The petitioner cites Armstrong v. Daily, 786 F.3d at 532 (2015) as holding that the destruction of the DNA sample following an inconclusive test prevented other tests on the same sample. Id. at 11. The petitioner further suggests that the sperm fraction on the toilet tissue matched the victim's father, but argues that her father never made an appearance in court and never was contacted by the parties. Id. at 12. The petitioner maintains that he became aware of Chadwick's DNA report only when he received his post-conviction discovery after trial. Id.

### 2. *Governing Law*

A criminal defendant has a right under the Sixth Amendment to effective assistance of counsel. See Strickland, 466 U.S. 668, 687. To establish that "counsel's assistance was so defective as to require reversal," a petitioner must show: (1) counsel's performance was deficient; and (2) counsel's deficient performance prejudiced the petitioner. Id. "This inquiry into a lawyer's performance and its effects turns on the facts of the particular case, which must be viewed as of the time of counsel's conduct." Laux v. Zatecky, 890 F.3d 666, 673–74 (7th Cir. 2018). "As for the performance prong, because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight, *Strickland* directs courts to adopt a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 674 (citation and quotation marks omitted).

31

"The prejudice prong requires the defendant or petitioner to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting Strickland, 466 U.S. at 694).

3.    *Discussion*

The Wisconsin Court of Appeals cited Strickland when analyzing the petitioner's claims, but applied state law in determining that the petitioner failed to show that he was entitled to an evidentiary hearing on counsel's ineffectiveness. The court wrote:

> When a defendant pursues postconviction relief based on trial counsel's alleged ineffectiveness, the defendant must preserve trial counsel's testimony in a postconviction hearing. *State v. Curtis*, 218 Wis. 2d 550, 554-55 . . . (Ct. App. 1998). However, a defendant is not automatically entitled to a hearing upon filing a postconviction motion that alleges ineffective assistance of counsel.
>
> To earn a hearing on a postconviction motion, the defendant must allege "sufficient material facts that, if true, would entitle the defendant to relief." *State v. Allen*, . . . 274 Wis. 2d 568 . . .. If the motion alleges sufficient facts, a hearing is required. *Id.* If the motion is insufficient, if it presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court may exercise its discretion in deciding whether to grant a hearing. *Id.* We review the court's discretionary decision under the deferential erroneous exercise of discretion standard. *Id.*
>
> We are not convinced that [the petitioner] was entitled to a hearing on his claim of ineffective assistance of counsel. To begin, [the petitioner] did not present an affidavit from the forensic program technician detailing what he would have said had he been called. Moreover, there is no reason to believe that the technician's testimony would have helped the defense. [The petitioner] makes much of the fact that the technician's report did not show the presence of semen on vaginal and anal swabs from the victim. However, that same report revealed the presence of micro sperm on

32

a vaginal smear taken from vaginal swabs and on an anal smear taken from anal swabs. Thus, there was genetic material to test, and the DNA analyst was able to link what she tested to [the petitioner]. Given these facts, as well as the other strong evidence of [the petitioner's] guilt, there is no reasonable probability that [the petitioner] was prejudiced by counsel's alleged error.

As-Saffat, 2020 WL 1160975, *3.

The court added two footnotes regarding the petitioner's challenges to the evidence:

[3][The petitioner] questions the DNA analyst's ability to conduct some of her testing by citing the following language from the technician's report: "2 [anal] swabs consumed for extraction, no sample remaining." As noted by the circuit court, that language does not necessarily mean that there was no sample left for the DNA analyst to test. Rather, it "may mean simply that there was no additional sample remaining for further testing; not that the samples [the technician] extracted were consumed during the extraction process."

[4]At one point in her testimony, the DNA analyst misspoke and inserted the victim's last name in place of [the petitioner's]. That misstatement does not undermine her conclusion, as reflected elsewhere in her testimony and report, which linked the DNA that she tested to [the petitioner].

Id. at *3, n.3, 4.

Neither party addressed the fact that the Wisconsin Court of Appeals found the petitioner had failed to establish sufficient facts to warrant relief under Allen and therefore the decision was reviewed under a discretionary standard. The Seventh Circuit has "consistently held that *Allen* constitutes an adequate and independent state law ground, even when it is applied to federal claims regarding ineffective assistance of counsel." Whyte v. Winkleski, 34 F.4th 617, 628 (7th Cir. 2022). As the Seventh Circuit explained in Whyte, a Wisconsin court "must always examine the substance of the underlying claim

to determine whether it is sufficiently pleaded," but <u>Allen</u> remains "adequate and independent state law ground, even when it is applied to federal claims regarding ineffective assistance of counsel." <u>Whyte</u>, 34 F.4th at 628. This court has found procedural default even where the state court addressed <u>Strickland</u>'s standards and then applied <u>Allen</u>'s procedural rule. <u>Moore v. Wisconsin</u>, Case No. 24-cv-603, 2025 WL 1555371, *5 (E.D. Wis. May 30, 2025).

Technically, the petitioner has procedurally defaulted on these claims and the court must consider whether to excuse the default if the petitioner establishes "cause for the default and actual prejudice as a result of the alleged violation of federal law," or "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). Again, the petitioner—who presented his own arguments in his postconviction motion—has not shown outside interference with his ability to make the arguments and he has not shown a miscarriage of justice.

But the analysis here is not quite that simple because the respondent did not argue independent or adequate state law grounds in his response. Although the respondent did not intentionally waive or relinquish this defense, it is possible that the respondent's failure to argue <u>Allen</u> could be considered a forfeiture. <u>See Whyte</u>, 34 F.4th at 626. But the "failure to plead an affirmative defense in the answer works as a forfeiture only if the [petitioner] is harmed by the [respondent's] delay in asserting it." <u>Id.</u> This requirement is designed to avoid surprise and undue prejudice to the petitioner who did not have an opportunity to demonstrate why the respondent should not prevail. <u>Id.</u> The

34

Seventh Circuit has ruled that there was no ambush where the Wisconsin Court of Appeals determined that a claim was subject to <u>Allen</u>'s procedural bar. <u>Id.</u> The Seventh Circuit also rejected the argument that a reference to <u>Strickland</u> meant that the court had ruled on the merits rather than resting on an adequate and independent state procedural ground. <u>Id.</u> at 627.

In any event, the court need not rest its decision on the procedural bar because the petitioner has not established that the failure to call Chadwick was prejudicial under <u>Strickland</u>. Chadwick's report documented that approximately two-thirds of all four vaginal swabs remained for testing. Dkt. No. 11-4 at 104. Chadwick detected micro sperm on the anal smear and the vaginal smear. <u>Id.</u> at 106. Dobrowski's testimony was not contradictory; she was able to identify the petitioner as the source of the DNA obtained from the sperm fraction. <u>Id.</u> at 112; Dkt. No. 11-10 at 104. Dobrowski testified that she had a degree in molecular biology and had worked for the state crime lab in Milwaukee for the past seventeen and a half years. Dkt. No. 11-10 at 65. She explained DNA, the testing process and how she performs an analysis on the amplified sample. <u>Id.</u> at 68-73. She admitted that Chadwick's testing was inconclusive:

> Q: And was there a presence of semen on the underwear?
>
> A: The presence on the initial testing by Mr. Chadwick of semen on the underwear was inconclusive. I then went on, when I was performing my DNA testing, and did a confirmatory test of that and confirmed the presence of semen on that item.
>
> Q: Can you describe what kind of test briefly you used?

A:     For the initial tests it's called a presumptive test. That tells us that semen may be present. The presumptive test is a—chemical change—chemical color change test, excuse me, a chemical's added, it sits for a few minutes. We add another chemical. If no semen is present, the liquid chemical with the item would turn yellow. If semen is present, the liquid present with the item turns blue.

         Sometimes when we get an inclusive result, say the liquid chemical surrounding the small cutting of the item we are taking stays yellow, but the sample itself might turn a green color, so it's hard to tell at that point what it's doing, and that's actually fairly common and that's why we have the—what's called a confirmatory test in which I would take a small piece and let it soak for a while, spin some cells down and see if there are any sperm cells present using a microscope and a slide.

         The forensic program technicians do not make their own slides. They will happily examine the ones that are prepared at the Sexual Assault Treatment Center, but when it comes to, say, an item like a pair of underwear, they will do the presumptive test, and then it's up to me as the analyst to perform the confirmatory test on that. So that's why Mr. Chadwick initially got an inconclusive result, but then I then confirmed the presence of semen on that item.

Dkt. No. 11-10 at 82-83.

On cross-examination, defense counsel confirmed that Chadwick's initial stain analysis was inconclusive for the presence of semen and that Dobrowski was satisfied with Chadwick's analysis. Id. at 99. Counsel explored the discrepancies between the initial test and the confirmatory test:

Q:     And your conclusion differed from Chadwick's, correct?

A:     It did not differ, no.

Q:     Well, he said that there was no semen on the underwear, correct?

A:     He said it was inconclusive. The results for the first chemical presumptive test were plus—what's called a plus minus,

where as I described say, the fabric, the small cutting of fabric from the underwear might turn a green color instead of the blue that we're looking for. In that case, it's appropriate to go on to a confirmatory test to see if semen is present.

Q: So he didn't find it, you did, correct?

A: Mr. Chadwick would not perform a smear on that item. That is the standard procedure at the laboratory.

Q: So he didn't find it, you did, correct?

A: I—I confirmed the presence of semen, yes.

Q: Did he find the presence of semen on the underwear, yes or no?

A: That's not—There's not a simple yes or no answer for that.

Q: Well, I think you previously testified he, Chadwick, found no semen on the underwear, correct?

A: I said it was inconclusive.

Q: Okay. As opposed to finding a conclusive finding—finding it conclusively, inconclusive—inconclusive finding means that you didn't find anything, they're—they're one and the same, correct?

A: No, they're not.

Q: Okay. Well, Chadwick's analysis was inconclusive for the presence of semen on [the victim's] underwear, true?

A: True.

Q: And your test was conclusive for the presence of semen on underwear, correct?

A: Correct. If I can describe how –

Q: I—I'd prefer if you just answered my questions, ma'am. So he was—his test was inconclusive and yours was conclusive, true or false?

A: True based on the cutting he took.

Q: I'm sorry?

A: True based on the cutting he took from the underwear.

Dkt. No. 11-10 at 99-100.

Defense counsel then asked about the sperm fraction DNA found on the anal swab:

Q: Did Chadwick do the initial stain analysis of that? Or did you?

A: Mr. Chadwick did.

Q: Okay. And that time he conclusively found—he was able to make a conclusive conclusion, correct?

A: He did the confirmatory test that identified semen, yes.

Q: Who did the initial test then?

A: He did that as well.

Q: Okay. So is there a reason that you did the confirmatory test on bullet point number one and he did the initial test and then with respect to the third bullet point he did both?

A: Yes.

Q: What's the explanation?

A: The explanation is, and I believe I stated this before, the Sexual Assault Treatment Center when they collect vaginal swabs, anal swabs, cervical swabs also prepare what's called a smear, which is a microscope slide that he can easily examine quickly to confirm or exclude the presence of semen on those swabs. So the smears are prepared from the swabs. With an item such as underwear, the forensic program technicians at the laboratory do not prepare their own microscope slides. It is up to me as the DNA analyst to prepare a DNA—a slide from the cutting that Mr. Chadwick has taken from the underwear to confirm the presence of semen.

38

> So while the initial presumptive tests, the test that semen
> may be present, was inconclusive, from that same evidence
> from the same cutting that he took, I was able to confirm the
> presence of semen there.

Dkt. No. 11-10 at 103-104.

The petitioner never presented an affidavit from Chadwick about what he would have testified to or suggested that Chadwick's testimony would have contradicted his actual report. The petitioner never presented an affidavit from *anyone* who would have testified that Dobrowski's confirmatory tests were flawed. Chadwick's findings with respect to semen on the underwear were inconclusive; Dobrowski's report and testimony explain that by extracting the semen using a differential extraction technique, she identified the petitioner as the source of the DNA obtained by the sperm fractions. Dkt. No. 11-4 at 111; Dkt. No. 11-10 at 101. The petitioner's statement that he first learned of the report after the trial is undermined by his own statements at the final pretrial conference. The petitioner told the circuit court that he wanted counsel to call Troy Chadwick because "the first analysis was inconclusive and there was nothing there." Dkt. No. 11-7 at 70.

Even without Dobrowski's report and testimony, the victim, who was in seventh grade, testified in detail about what happened to her and positively identified the petitioner in the courtroom. Dkt. No. 11-9 at 113. The sexual assault nurse examiner from Aurora Sinai Medical Center testified that the victim had multiple tears in the vaginal area—including a two-centimeter, fresh tear with active bleeding—and swelling indicative of blunt force trauma to the

39

area and consistent with sexual assault. Dkt. No. 11-10 at 26-28. The nurse examiner testified that to a reasonable degree of medical certainty, her findings were consistent with the victim's reports to her. Id. at 30.

In addition, the jury saw video evidence of the petitioner and the victim at the hotel, dkt. no. 11-9 at 109-110, and the victim identified the man in the video as the petitioner and the one who raped her, id. at 109, 113. The petitioner testified that he fled the police. Dkt. No. 11-11 at 103. Sergeant Rick Burmeister, a member of the Fugitive Apprehension Unit, testified that the petitioner locked himself in a basement furnace room and resisted arrest. Dkt. No. 11-9 at 54-59; Dkt. No. 11-11 at 103-107. The petitioner testified that he had been convicted eight times, that he had just left the House of Corrections and that he took the victim to the motel room where he was living because he was a "protector" and she needed help. Dkt. No. 11-11 at 75-78, 135-142. When asked about the DNA evidence, the petitioner testified that he had left a condom in his garbage but that when he returned to the motel the victim was sitting on the bed in front of the condom. Id. at 98. He testified that he took the condom and put it "in the garbage again," the implication being that the victim removed it from the garbage to smear it in her underwear to frame him. Dkt. No. 11-11 at 98-102. He further testified that he never told the police his suspicion about the used condom until the police started mentioning the DNA. Id. at 102-103. Finally, the petitioner told the jury that this was his fourth trial in nine months; at that point, the court interjected and clarified that it was "the first and only trial in this case." Id. at 118.

On this record, the petitioner has not shown a reasonable probability that Chadwick's testimony or the testimony of any other DNA expert would have changed the result of the trial.

D.      Violation of Wis. Stat. §970.04

The petitioner next argues a violation of Wis. Stat. §970.04, which he says gave rise to violations of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments and Article I, §7 of the Wisconsin Constitution. Dkt. No. 1 at 15. According to the petitioner, officers made a warrantless arrest on September 13, 2013, and charged him in State v. As-Saffat, Milwaukee County Case No. 2013CF4277. Id. at 15. The petitioner says that the court commissioner dismissed the complaint on the defense's motion and remanded the petitioner to custody for seventy-two hours to allow the state to reissue its charges. Id. Two days later, the state charged the petitioner in State v. As-Saffat, Milwaukee County Case No. 13CF4303; the petitioner waived the preliminary hearing and the court later dismissed the case without prejudice at the start of trial when the witness was unavailable. Id. The petitioner said that on March 17, 2014, the state charged him a third time—State v. As-Saffat, Milwaukee County Case No. 2014CF1066—repeating the twice dismissed charges. Id.

"The remedial power of a federal habeas court is limited to violations of the petitioner's federal rights, so only if a state court's errors have deprived the petitioner of a right under federal law can the federal court intervene." Perruquet v. Briley, 390 F.3d 505, 511 (7th Cir. 2004). This means that federal

courts do not review a state court's application of its own state law. See, *e.g.*, Swarthout v. Cooke, 562 U.S. 216, 219 (2011).

In his state appellate brief, the petitioner argued that the "district attorney abused its discretion when it erroneously applied clearly established state law as determined by Wis. Stat. §970.04" "when it reissued identical charges in a third criminal complaint filing inconsistent with an appeal thereafter same charges were previously dismissed in a first and second complaint filing (§970.04)." Dkt. No. 11-4 at 2. He argued that the Wisconsin statute was unambiguous and does not allow a district attorney to reissue charges. Id. at 56-57. The petitioner relied exclusively on Wisconsin authority, with one exception. On page 61 of his brief he stated, "[a]ll State Courts are bound by the decisions of the U.S. Supreme Court" and he cited Article 6, Clause 2 of the United States Constitution. Id. at 61. But the petitioner did not cite to federal law or any decision by the United States Supreme Court.

The Wisconsin Court of Appeals wrote:

The first argument we address on appeal is [the petitioner's] contention that he was improperly charged. According to [the petitioner], the State's reissuance of charges after dismissal of Milwaukee County case Nos. 2013CF4277 and 2013CF4303 violated Wis. Stat. § 970.04 (2017-18).

Wisconsin Stat. § 970.04 provides, "If a preliminary examination has been had and the defendant has been discharged, the district attorney may file another complaint if the district attorney has or discovers additional evidence." "This statute forbids reissuance of a complaint if the evidence presented at a preliminary hearing was insufficient, unless the state comes forward with new or previously unused evidence." *State v. Hoffman*, 106 Wis. 2d 185, 196 . . . (Ct. App. 1982). The application of a statute to a set of facts is a question of law that we review de novo. *Acuity v. Albert,* . . . 343 Wis. 2d 594 . . ..

> Here, we are not persuaded that Wis. Stat. § 970.04 applies. After all, neither one of [the petitioner's] prior cases was dismissed at a preliminary hearing because of insufficient evidence. Milwaukee County case No. 2013CF4277 was dismissed before a preliminary hearing due to a technical error in the complaint. Meanwhile, Milwaukee County case No. 2013CF4303 was dismissed at trial, after [the petitioner] had waived the preliminary hearing, due to the unavailability of the victim. Given these differences, Wis. Stat. § 970.04 did not prevent the State from reissuing charges against [the petitioner].

As-Saffat, 2020 WL 1160975 at *2.

The petitioner's argument that the district attorney violated the state statute is not cognizable under federal law. In addition, the federal court may grant a petition for writ of *habeas corpus* only where the applicant has given the state courts a fair opportunity to hear and act on his claims. To the extent the petitioner has included citations to constitutional amendments in his petition, he never raised these arguments before the state courts even though he was representing himself, and he fails to explain how the application of the state statute violated his constitutional rights.

E.    Speedy Trial

In his final argument, the petitioner asserts that he was denied his "Speedy Trial 'release'" in violation of the Wisconsin Statute §971.10(4), the 6th and 14th Amendment, §1, of the U.S.C. and Art. I, §7 of the Wisconsin Constitution." Dkt. No. 1 at 26. The petitioner never raised this issue in his state appellate brief or in his petition for review to the Wisconsin Supreme Court. Dkt. No. 11-4, Dkt. No. 11-6. To the extent that he alleges a violation of the state statute, that claim is not cognizable on federal review. These claims

43

are procedurally defaulted because the petitioner never gave the state courts an opportunity to act on his claims. See O'Sullivan v. Boerckel, 526 U.S. 838, 842–44 (1999). As explained above, the petitioner has failed to show cause for the procedural default by pointing to anything external to him, and not fairly attributable to him, that impeded his efforts to comply with the rule. Maples v. Thomas, 565 U.S. 266, 280-281 (2012). Nor has he showed prejudice—that the errors at trial worked to his actual and substantial disadvantage. Shinn v. Ramirez, 596 U.S. 366, 379–80 (2022). Finally, the petitioner has not established a miscarriage of justice—that he was actually innocent.

### III. Motion for Release (Dkt. No. 28)

On January 26, 2026, the petitioner filed a motion for release on personal recognizance bond under Federal Rule of Appellate Procedure 23. Dkt. No. 28 at 1. He reasserts the history of his case and the arguments raised in his petition. Id. at 22. He asks to be released to restart his business, and be reunited with his family. Id. at 22. Because the court is denying his petition, the motion is moot and the court will deny it.

### IV. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved

44

in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). No reasonable jurist could debate that the petitioner is not entitled to *habeas* relief, so the court will not issue a certificate of appealability.

## V.     Conclusion

The court **DENIES** the petition for writ of *habeas corpus.* Dkt. No. 1.

The court **DENIES AS MOOT** the petitioner's motion for release. Dkt. No. 28.

The court **ORDERS** that this case **DISMISSED**. The clerk shall enter judgment accordingly.

The court **DECLINES TO ISSUE** a certificate of appealability.

Dated in Milwaukee, Wisconsin this 30th day of June, 2026.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

45